637 A.2d 117

**Vernon Lee EVANS, Jr.**

v.

**STATE of Maryland.**

**No. 149, Sept. Term, 1992.**

Court of Appeals of Maryland.

Feb. 16, 1994.

662

James Wyda, Asst. Public Defender (Stephen E. Harris, Public Defender, George E. Burns, Jr., Asst. Public Defender, on brief), George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, James Wyda, Assistant Public Defender all on brief), Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Tarra DeShields–Minnis, Asst. Atty. Gen., on brief), Baltimore, for appellee.

**666**

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI, and ROBERT M. BELL, JJ.

KARWACKI, Judge.

In April of 1983, Vernon Lee Evans, Jr., appellant, was hired by Anthony Grandison to kill David Scott Piechowicz and his wife, Cheryl, who had been subpoenaed to testify against Grandison in the United States District Court for the District of Maryland in a narcotics case. Evans was promised $9,000 for committing the murders. With the help of his former girlfriend, Charlene Sparrow, Evans rented a room for two nights, April 27 and 28, 1983, in the Warren House Hotel in Baltimore County where both Mr. and Mrs. Piechowicz were employed.

Mrs. Piechowicz was scheduled to work on April 28, 1983, but persuaded her sister, Susan Kennedy, to substitute for her at the hotel's front desk. On that day, Evans and Sparrow saw a male and female working at the front desk of the hotel as they left the hotel to go to a restaurant. Later that day, Evans returned to the hotel and shot and killed Mr. Piechowicz and Ms. Kennedy, apparently believing that she was Mrs. Piechowicz.

Evans was convicted of first degree murder of both victims by a jury in the Circuit Court for Worcester County where the case had been removed upon his suggestion that he could not receive a fair trial in Baltimore County. That jury sentenced him to death on each of the convictions. We affirmed those judgments. *Evans v. State,* 304 Md. 487, 499 A.2d 1261 (1985), *reconsideration denied,* 305 Md. 306, 503 A.2d 1326, *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

(1986) (*Evans II*).[1]

On March 28, 1991, the Circuit Court for Worcester County granted Evans partial post conviction relief by vacating his death sentence. On Evans' suggestion for removal, the case was transferred to the Circuit Court for Baltimore County. A jury in that court sentenced Evans to death for each of the convictions of first degree murder. This appeal followed. We shall consider each of appellant's contentions, adding additional facts where necessary.

## I

During *voir dire* examination of the prospective jurors, Evans asked that the following question be posed to each prospective juror:

"Would the fact that Vernon Evans has been convicted of two first degree murders in this case cause you to automatically vote for the death penalty, regardless of the facts?"

Evans contends that the court's failure to do so was reversible error.[2] We do not agree.

---

1. Evans had previously come before this Court on an interlocutory appeal which preceded his trial and initial capital sentencing. Because he had previously been convicted of federal civil rights charges arising out of the same incident, Evans claimed that prosecution in the Maryland courts would place him twice in jeopardy. In *Evans v. State*, 301 Md. 45, 481 A.2d 1135 (1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1411, 84 L.Ed.2d 795 (1985) (*Evans I* ), we applied the dual sovereignty exception to the Double Jeopardy Clause and rejected his contention.

2. Evans previously raised a similar *voir dire* issue on direct appeal from his initial convictions and sentencing. In that proceeding, prospective jurors who stated that they would be unable to return a death sentence under any circumstances were excused for cause. *Evans v. State*, 304 Md. 487, 522, 499 A.2d 1261, 1279 (1985), *reconsideration denied*, 305 Md. 306, 503 A.2d 1326, *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986) (*Evans II* ). Citing various studies, Evans claimed that exclusion of this group of jurors during the guilt or innocence phase of proceedings resulted in a "conviction prone" jury and violated his rights to an impartial jury and to equal protection of the laws. *Id.* We rejected his contention, citing our reasoning in *Foster v. State*, 304 Md. 439, 457–66, 499 A.2d 1236, 1245–50 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).

 We begin an analysis of this contention by placing Evans' requested *voir dire* question in perspective. The Sixth and Fourteenth Amendments of the U.S. Constitution and Article 21 of the Maryland Declaration of Rights guarantee that if a criminal defendant is tried by a jury, that jury must be impartial. *See, e.g., Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Turner v. Louisiana,* 379 U.S. 466, 471–72, 85 S.Ct. 546, 549, 13 L.Ed.2d 424, 428 (1965); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 756 (1961); *Couser v. State,* 282 Md. 125, 138, 383 A.2d 389, 396–97, *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978); *Bristow v. State,* 242 Md. 283, 288–89, 219 A.2d 33, 36 (1966). The constitutional right to an impartial jury is basically protected through questions asked during the *voir dire* procedure which are aimed at discovering cause for juror disqualification. *Couser, supra,* 282 Md. at 138, 383 A.2d at 397. Cause for exclusion of a juror may take several forms, including racial and ethnic bias, *Turner v. Murray,* 476 U.S. 28, 36–37, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27, 37 (1986); *Rosales–Lopez v. United States,* 451 U.S. 182, 192, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22, 31 (1981); a bias in favor of law enforcement officers, *Langley v. State,* 281 Md. 337, 348, 378 A.2d 1338, 1343 (1977); and, in the case of capital juries, bias arising from strong beliefs concerning the death penalty. *Lockhart v. McCree,* 476 U.S. 162, 173, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137, 147 (1986); *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776, 785 (1968); *Grandison v. State,* 305 Md. 685, 506 A.2d 580, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). We took note of the essential role of the *voir dire* procedure in *Bedford v. State,* 317 Md. 659, 566 A.2d 111 (1989):

> " ' 'If there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice.... Otherwise, the right to trial by an impartial jury guaranteed him ... might well be impaired.' ' "

*Id.* at 671, 566 A.2d at 117 (quoting *Brown v. State,* 220 Md. 29, 35, 150 A.2d 895, 897–98 (1959) (in turn quoting *State v. Higgs,* 143 Conn. 138, 120 A.2d 152 (1956))).

Jury selection in the instant case began on October 27, 1992. One hundred twenty-five prospective jurors were called and sworn, and the court began by explaining the case to the venire and asking questions of the group. The members of the venire were then brought into the judge's chambers and interviewed individually. There, the court posed questions designed to elicit their feelings about capital punishment. Both Evans and the State referred to the *voir dire* of prospective juror Callahan as a representative sample of questions posed:

THE COURT: ... Some feel that the death penalty should be imposed in every case of first degree murder, and others feel that the death penalty should never be imposed.

Do you feel or do you have any strong feelings one way or the other about the imposition of the death penalty?

[Prospective Juror] CALLAHAN: No.

THE COURT: Do you feel that your attitude, regarding the death penalty, would in any way prevent or substantially impair you from making a fair and impartial decision as to the Defendant's sentence in accordance with your oath as a juror, based upon the evidence presented and the Court's instructions as to the law which is applicable?

MS. CALLAHAN: No.

THE COURT: After listening to the evidence and applying the law, if you were convinced that the appropriate sentence would be death, would you be able to vote for the death penalty?

MS. CALLAHAN: Yes.

THE COURT: On the other hand, after listening to the evidence and applying the law, if you were not convinced the appropriate sentence should be death, but were convinced life was the appropriate sentence, would you vote for that alternative?

MS. CALLAHAN: Yes.

As a result of the questioning, 53 prospective jurors were removed for cause, 14 at the request of the State and 39 at the request of Evans. Eventually, 12 principal jurors and four alternates were impaneled.

Evans argues that the trial judge's questioning of potential jurors, as represented by the interview of prospective juror Callahan, was insufficient to determine whether jurors were predisposed toward the death penalty and that the questioning therefore violated his right to an impartial jury. In order to evaluate the adequacy of the *voir dire* in this case, we undertake a two-part analysis: first, we must determine the proper standard for exclusion of prospective jurors based on their beliefs about capital punishment; and second, we must determine whether the questions posed to the members of venire in this case were sufficient to uncover any pro-death penalty bias and measure that bias against the standard for juror exclusion.

## A

We have on several prior occasions discussed the standard for excluding jurors on the basis of beliefs concerning capital punishment. *See, e.g., Henry v. State*, 324 Md. 204, 596 A.2d 1024 (1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992); *Bowie v. State*, 324 Md. 1, 595 A.2d 448 (1991); *Hunt v. State*, 321 Md. 387, 583 A.2d 218 (1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991); *Grandison v. State, supra; Foster v. State*, 304 Md. 439, 499 A.2d 1236 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). Prior to 1968, it was common practice that a prospective juror would be excused from a capital jury if he or she held "conscientious scruples" against the imposition of the death penalty. *Corens v. State*, 185 Md. 561, 45 A.2d 340 (1946); *Price v. State*, 159 Md. 491, 151 A. 409 (1930). In 1968, the Supreme Court narrowed the permissible scope of this practice and held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed

conscientious or religious scruples against its infliction."
*Witherspoon v. Illinois, supra,* 391 U.S. at 522, 88 S.Ct. at
1777, 20 L.Ed.2d at 785. Nevertheless, if a juror had made it
clear that he or she would automatically vote against the death
penalty regardless of the facts or circumstances presented,
that juror might still be properly excluded for cause under the
*Witherspoon* standard. *Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21,
20 L.Ed.2d at 785 n. 21.

Subsequently, the Supreme Court modified the standard for
juror exclusions, stating that it refused to be bound by "ritual-
istic adherence" to the language of *Witherspoon's* footnote 21:

"[A] juror may not be challenged for cause based on his
views about capital punishment *unless those views would
prevent or substantially impair the performance of his
duties as a juror in accordance with his instructions and
oath.* The State may insist, however, that jurors will con-
sider and decide the facts impartially and conscientiously
apply the law as charged by the court."

*Wainwright v. Witt,* 469 U.S. 412, 421, 105 S.Ct. 844, 850, 83
L.Ed.2d 841, 849 (1985) (quoting *Adams v. Texas,* 448 U.S. 38,
45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 584 (1980)). We
acknowledged and applied the *Witt* standard in *Grandison v.
State, supra,* adding that deference must be given to a trial
judge's decision to exclude jurors if the judge feels that the
juror's views would substantially impair the performance of
the juror's duties. *Grandison,* 305 Md. at 725, 506 A.2d at
600.

*Witherspoon, Witt,* and *Grandison* centered on the exclu-
sion of a prospective juror because of his or her opposition to
the death penalty; the case before us differs in that it focuses
on jurors who may be predisposed in *favor* of the death
penalty. The Supreme Court has determined that in such
cases, known as "reverse-*Witherspoon*" cases, the same stan-
dard applies. In *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct.
2273, 101 L.Ed.2d 80 (1988), the Supreme Court recognized as
erroneous the trial court's refusal to remove for cause a
prospective juror who declared he would vote automatically to

impose the death penalty if the jury found the defendant guilty.[3] The Court restated its previous holding in *Witt*, stating that the proper standard for juror exclusion is whether the juror's views would "prevent or substantially impair the performance of his duties at a juror...." *Ross*, 487 U.S. at 85, 108 S.Ct. at 2276, 101 L.Ed.2d at 88. This principle was reaffirmed in the recent decision of *Morgan v. Illinois*, 504 U.S. ——, ——, 112 S.Ct. 2222, 2229, 119 L.Ed.2d 492, 5?? (1992).

In *Morgan*, the Supreme Court was faced with a "reverse-*Witherspoon*" situation. The State had asked prospective jurors, both individually and in a group setting, whether they would automatically vote against the death penalty, as permitted by *Witherspoon*. The defendant had requested that the trial court ask prospective jurors whether, assuming the defendant was found guilty, they would vote automatically for the death penalty. The trial court did not pose that question, but instead asked, "Would you follow my instructions on the law, even though you may not agree?" The Supreme Court held that the trial court's questioning was insufficient to determine whether a prospective juror possesses a bias toward the death penalty, and as such, it was constitutionally deficient. *Id.* at ——, 112 S.Ct. at 2235, 119 L.Ed.2d at 506.

It is important to note that *Morgan* left the standard for juror exclusion unchanged; jurors may still be excused on the basis of their beliefs about capital punishment if, in the determination of the trial judge, those beliefs will "substantially impair their performance as jurors." *Id.* at ——, 112 S.Ct. at 2229, 119 L.Ed.2d at 502. *Morgan* simply recognizes that the principles first propounded in *Witherspoon v. Illinois* "demand inquiry into whether the views of prospective jurors on the death penalty would disqualify them from sitting." *Morgan*, 504 U.S. at ——, 112 S.Ct. at 2231, 119 L.Ed.2d at

---

**3.** The error in *Ross* did not result in reversal, however, since the juror in question was subsequently removed by the defendant using a peremptory challenge. *Ross v. Oklahoma*, 487 U.S. at 85, 108 S.Ct. at 2277, 101 L.Ed.2d at 88.

504. The Supreme Court acknowledged that a juror who will "automatically," *id.* at ——, 112 S.Ct. at 2229, 119 L.Ed.2d at 502, vote for the death penalty "in every case," *id.*, has in essence already formed an opinion on the merits and will by definition fail the test of impartiality. *Id.* Similarly, the Court noted that general questions of fairness and "follow the law" questions are not sufficient to satisfy the inquiry, since

"jurors could in all truth and candor respond affirmatively [to questions of fairness], personally confident that such dogmatic views are fair and impartial. . . . It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining . . . dogmatic beliefs about the death penalty would prevent him or her from doing so."

*Id.* at ——, 112 S.Ct. at 2233, 119 L.Ed.2d at 506–07.

■ Although this Court has not, until now, considered the precise questions posed by *Morgan,* we have considered the standard for juror exclusion in a "reverse-*Witherspoon*" context. In *Hunt v. State, supra,* the defendant contended that the trial judge erred by failing to excuse for cause five prospective jurors who were allegedly predisposed to vote for the death penalty. We applied the *Witt* standard and stated that

"[j]urors who have a bias in favor of the death penalty that would prevent or substantially impair their performance as jurors should be excused. Jurors who may have an inclination to favor the death penalty, but who would nevertheless conscientiously apply the law, need not be excused."

*Hunt v. State,* 321 Md. at 415, 583 A.2d at 231. Recognizing that "the trial judge's factual determination about the extent of a juror's bias must be given deference," *id.* (citing *Grandison, supra,* 305 Md. at 725, 506 A.2d at 600), we found that the trial judge did not abuse his discretion in declining to strike the five jurors, all of whom were found to be able to perform their "duties as juror[s] in accordance with [their] instructions and [their] oath[s]." *Id.* at 416, 583 A.2d at 232 (quoting *Wainwright v. Witt, supra,* 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851–52). This is the standard that we will apply

to Evans' claim in light of the specific inquiry required by *Morgan.*

### B

█ Evans contends that the trial court's refusal to pose to individual prospective jurors the precise question he submitted concerning bias violated the *Morgan* standard, entitling him to a new resentencing. He further contends that the questions actually posed asked for jurors' "bottom line conclusions" similar to those described in our previous decision in *Bowie v. State, supra,* and thus failed to meet the *Witt* standard. We do not agree.

Where the questions asked of a prospective juror are insufficient to uncover bias, we have held that the lack of an adequate *voir dire* may be reversible error. *See Bowie v. State,* 324 Md. at 23–24, 595 A.2d at 459 (trial court's failure to specifically inquire about juror's beliefs on the death penalty and failure to incorporate substance of defendant's questions about racial prejudice and tendency to believe police officers is reversible error); *Brown v. State,* 220 Md. at 36, 150 A.2d at 898 (where defendant is black and victim of alleged homicide is a white police officer, trial court's refusal to inquire whether jurors would be able to give a defendant who is black as fair a trial as they would give a defendant who is white is reversible error). As described above, the principal failing of the *Morgan voir dire* was the absence of questions designed to uncover bias concerning the death penalty notwithstanding the defendant's request for such questions. In the instant case, some jurors were in fact posed Evans' requested question essentially verbatim. Others who were not asked the specific question were nevertheless questioned sufficiently. Using the exchange between the court and juror Callahan as an example, it is evident that the prospective jurors in Evans' resentencing were asked specifically whether they had "strong feelings one way or the other about the imposition of the death penalty." This phrase is clearly targeted toward jurors' feelings about capital punishment itself, distinct from any notions of general fairness or "following the law." Jurors were also asked

whether, if they were not convinced that the appropriate sentence would be death, but were convinced that life imprisonment would be the appropriate sentence, they would be able to vote for life imprisonment. It is unlikely that a juror who has no strong feelings about the death penalty will simultaneously vote for the death penalty regardless of the facts and circumstances of the case. On their face, the questions posed to prospective jurors by the court were clearly sufficient for Evans and his counsel to determine whether prospective jurors were death-penalty dogmatists, and they were clearly sufficient to meet the standard enunciated in *Morgan v. Illinois, supra.*

At oral argument, Evans' counsel made much of the fact that the sentencing was for two first degree murders. First, he contended that Evans' requested *voir dire* question was necessary to call attention to that fact. Because the record reflects that the judge informed the entire venire of the nature of the crime (i.e., a double murder) at the beginning of the jury selection process, we reject this argument. Counsel also suggested that Evans' requested *voir dire* question was required under *Morgan* because jurors who may possess no predisposition to impose the death penalty in the case of one first-degree murder may find themselves compelled to impose capital punishment when two murders are at issue. Leaving aside the dubious merits of that speculation, we have two observations about this contention. First, as we stated above, *Morgan* did not alter the standard for juror exclusion; jurors may be excused if their beliefs about capital punishment (i.e., their bias) would "substantially impair their performance as jurors." *Morgan v. Illinois,* 504 U.S. at ——; 112 S.Ct. at 2229; 119 L.Ed.2d at 502. The specific circumstances of a particular crime are irrelevant to one's pre-existing bias or predisposition and thus cannot be factored into the court's evaluation of a juror's ability to judge impartially. Second, we note that multiple murders are an aggravating factor for the jury to consider under the death penalty statute, Maryland Code (1957, 1992 Repl. Vol.), Art. 27, § 413(d)(9), and that the State relied on this aggravating factor. By presenting an

important aggravating factor in his *voir dire* question, Evans has stepped beyond a standard bias inquiry and essentially asked that the prospective jurors provide advance clues as to how they would vote based on the facts of this case. The Supreme Court has recognized that "a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him," *Witherspoon v. Illinois, supra,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21, 20 L.Ed.2d at 785 n. 21, and we have stated clearly that the sole focus of the *voir dire* procedure is the discovery of cause for the possible disqualification of potential jurors. *Bedford v. State, supra,* 317 Md. at 670, 566 A.2d at 116. Evans' proposed inquiry is beyond the scope of proper *voir dire,* and contrary to his assertion, *Morgan* does not change that conclusion.

Evans' reliance on our opinion in *Bowie v. State, supra,* is similarly misplaced. In *Bowie,* the trial court had asked the following question of the venire panel:

"Ladies and gentlemen, the State of Maryland has filed a request before the court that if found guilty, Mr. Damon Bowie be put to death. Is there any member of the prospective jury panel who has any feelings whatsoever about such a request, and I don't care which way you feel about it, that it would interfere with your ability to fairly and truly judge this matter based only on the evidence before the court?

Said another way, is there anybody in this room who has such feelings about the death penalty one way or the other that it would affect you emotionally or to the extent that it would override your ability to judge this matter based only on the evidence brought out in the courtroom and the instructions of the court to you and the application of that evidence to the law? If you have a positive response, please stand in place.

Those jurors who stood were excused for cause."

*Bowie v. State,* 324 Md. at 16, 595 A.2d at 455. We applied the *Witt* standard to the question posed by the trial judge and

found the trial court's inquiry lacking. We noted that in *Witt* and in our cases which applied *Witt,* the basis for the juror's conclusion, and therefore, for the court's ruling, was apparent in the record. *Id.,* 324 Md. at 22–23, 595 A.2d at 458. In *Bowie,* by contrast, we found only "a trial judge's propounding of a question designed to elicit from prospective jurors *their* bottom line conclusion as to their ability to serve on a capital sentencing jury." *Id.* We concluded that a simple answer to such a broad question would not automatically reveal disqualifying biases, and that by failing to inquire further, the trial court had not met the standard contemplated by *Witt* and its progeny. *Id.,* 324 Md. at 23–24, 595 A.2d at 459.

The trial court's inquiry in this case was not at all like that in *Bowie.* Returning to Ms. Callahan's interview, it is clear that the court interviewed prospective jurors individually and asked questions which were designed to identify their state of mind concerning the death penalty as well as their ability to evaluate the evidence impartially. From this questioning, the basis for the trial judge's conclusions whether to strike for cause or retain a given member of the venire is also evident from the record. The *voir dire* procedure in the case before us contained precisely what the *Bowie* procedure lacked.

The questions posed to the venirepersons were sufficient to uncover any pro-death penalty bias and measure that bias against the standard for juror exclusion. The trial court did not err in denying Evans' request that his specific *voir dire* question be asked of prospective jurors.

## II

■ Evans called as his witness Dr. Robert Johnson, an expert in the field of criminal justice and criminal behavior. Dr. Johnson testified that long-term prisoners, or "lifers," tend to adjust very well to their surroundings, gain a sense of community, and commit very few penal infractions. He also testified that in his expert opinion, Evans would fit this pattern if he was sentenced to life imprisonment. Under cross examination by the State, Dr. Johnson admitted that

there were exceptions to his theory, but he declined to comment on any specific examples with which he was not involved.

The prosecution subsequently referred to Dr. Johnson's testimony during closing argument:

"And then when Mr. Cox asked him about the riot at the Penitentiary done by lifers and long-termers, he didn't check into that, or Mr. Dean, who escaped from the Super Max, who was a lifer—."

Defense counsel objected to the reference to Mr. Dean and his escape, noting that no evidence concerning Mr. Dean's escape had been offered during the trial. The trial court overruled the objection, stating that "[I]t's argument only, counsel." Evans claims that this argument unduly prejudiced his defense, impermissibly suggesting to the jury that he would be likely to escape and thus prove a danger to society.

Although the permissible scope of closing argument is not without limits, "such comment or argument is provided a wide range." *Henry v. State, supra,* 324 Md. at 230, 596 A.2d at 1037 (quoting *Wilhelm v. State,* 272 Md. 404, 412, 326 A.2d 707, 714 (1974)). The boundaries of that range are to be set by the trial judge, and as we recently stated in *Henry:*

"The inference of any impropriety occurring in closing arguments 'must of necessity rest largely in the control and discretion of the presiding judge and an appellate court should in no case interfere with that judgment unless there has been an *abuse of discretion* by the trial judge of a character likely to have injured the complaining party.'"

*Id.* (quoting *Wilhelm,* 272 Md. at 413, 326 A.2d at 714–15).

Even if the prosecutor's remark had been improper, it would not necessarily constitute reversible error. The Supreme Court has stated that

"it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."

*Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). We, too, have recognized this standard:

> "[T]he mere fact that a remark made by the prosecutor to the jury was improper does not necessarily require a conviction to be set aside. Reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused."

*Jones v. State*, 310 Md. 569, 580, 530 A.2d 743, 748 (1987), *vacated and remanded on other grounds*, 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916, *sentence vacated on other grounds*, 314 Md. 111, 549 A.2d 17 (1988) (citations omitted). *See also Oken v. State*, 327 Md. 628, 676, 612 A.2d 258, 281–82 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Booth v. State*, 327 Md. 142, 608 A.2d 162, *cert. denied,* —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992) (*Booth IV*); *Reidy v. State*, 8 Md.App. 169, 172, 259 A.2d 66, 67–68 (1969).

We are unwilling to state that the remark in this instance is *per se* improper. It is true that a prosecutor ordinarily may not comment on matters not in evidence, but "it is proper for counsel to argue to the jury—even though evidence of such facts has not been formally introduced—matters of common knowledge or matters of which the court can take judicial notice." *Wilhelm v. State*, 272 Md. 404, 438, 326 A.2d 707, 728 (1974). One of the statements at issue in *Wilhelm* was a remark made by the prosecutor in closing argument that "[l]ast year some three hundred thirty people were murdered in Baltimore City." [4] *Id.* This statistic had not been introduced as evidence, but we noted that the murder tally had been in the headlines of the local papers just 19 days before

---

**4.** Actually, this statement was made during closing argument in *Wilhelm's* companion case, *Cook v. State*. Because of the similar issues presented by both cases, *Wilhelm* and *Cook* were consolidated for argument and disposed of in one opinion.

the closing argument. Consequently, we held that, based upon the widespread publicity given this data, the prosecutor's reference to the number of murders "was but a direction by him to the jury of a fact that was within their common knowledge." *Id.*, 272 Md. at 440, 326 A.2d at 729. *See also* 75A Am.Jur.2d, Trial § 612 (1991, 1993 Cum.Supp.) (even though evidence of certain facts has not been formally introduced, proper for counsel to refer, by way of illustration, to well-known facts in history, literature, science, and the public press).

Because the escape of Mr. Dean, who was serving a life sentence, was so widely publicized before Evans' resentencing hearing, we believe it falls under the general exception allowing comment on matters of common knowledge to the jury. Harold Benjamin Dean's November, 1991 escape from "Super-Max," an institution which was touted as Maryland's most secure prison, was well-publicized. It was even the topic of an episode of *America's Most Wanted,* a nationwide television series that broadcasts descriptions of fugitives. *America's Most Wanted* (Fox television broadcast, May 1, 1992). Several events in addition to the escape itself helped to keep this incident in the headlines between the time of the escape in November of 1991 and Evans' resentencing hearing in October and November of 1992. In June of 1992, publicity was generated by the arrest of Dean's wife, her sister, and two more of Dean's relatives as accomplices in his escape. *See, e.g., 4 Accused of Plot that Freed Killer from Supermax: State Police Arrest Common–Law Wife and Her Sister,* Balto. Morning Sun, June 7, 1992, at 1A; *Prison Escape Suspects Arrested,* Wash. Post, June 8, 1992, at D5; *Police Arrest 4 as Escape Accomplices,* Wash. Times, June 8, 1992, at B2. Perhaps most relevant is the fact that Dean was recaptured in October, 1992, shortly before Evans' trial began. Numerous articles appeared in the local papers, including: *FBI Finds Killer in Ohio Town: Dean Escaped Supermax in 1991,* Balto. Morning Sun, October 2, 1992, at 1E; *Killer Who Escaped Supermax is Captured in Ohio: Harold B. Dean, Free for 10 Months, is Arrested by FBI,* Balto. Evening Sun,

October 2, 1992, at 1A; *Md. Killer Well Guarded in Ohio,* Balto. Morning Sun, October 6, 1992, at 10C; and, *Supermax Escapee Finds Ohio Jail Worse,* Balto. Morning Sun, November 5, 1992, at 1B. Considering the wealth of publicity given the escape and recapture and its temporal proximity to Evans' resentencing hearing, the prosecutor's reference to Harry Dean's escape from "SuperMax," as in *Wilhelm,* "was but a direction by him to the jury of a fact that was within their common knowledge." *Wilhelm, supra,* 272 Md. at 440, 326 A.2d at 729.

▆▆ Even if the prosecutor's remark is deemed improper, we cannot say that it prejudiced Evans to the point that the jury was misled. We recently encountered an example of such prejudice in *Johnson v. State,* 325 Md. 511, 601 A.2d 1093 (1992). We concluded in *Johnson* that the prosecutor's argument was prejudicial because, in calling attention to the criminal defendant's right to appeal a conviction and suggesting that a conviction may be overturned, it tended to lessen the jury's sense of responsibility for reaching a guilty verdict. *Id.* at 518, 601 A.2d at 1096. *See also Poole v. State,* 295 Md. 167, 196, 453 A.2d 1218, 1233 (1983) (in capital sentencing proceeding, prosecutor's reference to possibility of parole is improper); *Shoemaker v. State,* 228 Md. 462, 469, 180 A.2d 682, 685 (1962) (reference to possibility of parole suggests to jury that it might shift responsibility for finding defendant guilty to some other body). In the instant case, by contrast, we have only a reference to a prior prison escape by an inmate who was serving a life sentence. Although Harry Dean's escape was not formally in evidence, a reference was made during cross-examination to the "exceptions" to Dr. Johnson's theory. Dean was another of these "exceptions." It is inconceivable that this single reference would alter the manner with which the jury approached its responsibilities. That a jury might have inferred that Evans would escape from prison because Dean escaped from "SuperMax," and that this inference would be strong enough to convert a life imprisonment sentence into a death sentence, is pure speculation. Moreover, the trial court gave a curative instruction, twice caution-

ing the jury that opening statements and closing arguments of counsel are not evidence.

We believe that the prosecutor's reference to the Dean escape was ill-advised. However, given the widespread publicity which appeared just prior to Evans' hearing coupled with the lack of demonstrable prejudice, we conclude that the trial judge did not abuse his discretion in allowing the prosecutor to make reference to the escape.

## III

The jury had before it a presentence investigation report ("PSI") which had been admitted into evidence. Evans asked the trial court to redact that portion of the PSI which noted Evans' initial refusal to speak to the presentence investigator.[5] The trial court denied the request. Evans asserts that the jury could have assumed that his decision not to speak with the investigator was prompted by his lack of remorse, contradicting his statement in his allocution that he was sorry for what he had done. Citing *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), he contends that submitting the full, unredacted report to the jury violated his Fifth Amendment right against self-incrimination.[6] *Estelle* concerned a capital sentencing procedure, and the issue in that case was whether a defendant could be compelled to submit to

---

5. The PSI contains two similar statements. Under the heading entitled "Statement of Defendant" appears the following: "On June 15, 1984, Vernon Evans, Jr. informed this writer that he did not wish to make any statement in regards to the present offense." In the subsequent section entitled "Evaluation," the report reads, "It should be noted that when this writer attempted to interview the subject at the Maryland Penitentiary on June 15, 1984, Mr. Evans declined to be interviewed."

6. Article 22 of Maryland's Declaration of Rights also guarantees a defendant's right against compelled self-incrimination. We have interpreted the state constitutional privilege to be generally *in pari materia* with the federal Fifth Amendment. *Choi v. State*, 316 Md. 529, 535 n. 3, 560 A.2d 1108, 1111 n. 3; *Lodowski v. State*, 307 Md. 233, 246–47, 513 A.2d 299, 306–07 (1986); *State v. Panagoulis*, 253 Md. 699, 707 n. 3, 253 A.2d 877, 881 n. 3 (1969); *Brown v. State*, 233 Md. 288, 296, 196 A.2d 614, 617–18 (1964).

a court-ordered psychiatric examination for purposes of determining his future dangerousness. Specifically, the defendant complained that statements he made to the psychiatrist in the course of the examination were admitted against him at his sentencing hearing in violation of his privilege against self-incrimination. The Supreme Court held that such a compelled examination violated the defendant's Fifth Amendment right against compelled self-incrimination.

The State agrees that under *Estelle*, there is no basis to distinguish between the guilt and penalty phases of a defendant's trial as far as the Fifth Amendment is concerned, but pointing to the *Estelle* Court's express statement that "we do not hold that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing decision," 451 U.S. at 469 n. 13, 101 S.Ct. at 1876 n. 13, 68 L.Ed.2d at 373 n. 13, it counters that those constitutional concerns are not at work in the instant case. Furthermore, the State notes that the prosecution made no mention of the statement at issue here during the hearing, and the judge instructed the jury that Evans' failure to testify at the resentencing hearing could not be considered by the jury. Under these facts, argues the State, no cause for reversal exists. We agree with the State's conclusion.

We need not decide whether the Fifth Amendment was violated, for even if there was error we are convinced that such error was harmless. Under the rule of *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976), erroneously admitted evidence is deemed harmless if we are able to "declare a belief, beyond a reasonable doubt, that the error in admitting the challenged evidence in no way influenced the jury's verdict." *Krauss v. State*, 322 Md. 376, 389, 587 A.2d 1102, 1108 (1991) (citing *Dorsey v. State*, 276 Md. at 659, 350 A.2d at 678). The standard is a strict one, but it is met handily by the facts of this case. In the context of all of the evidence of aggravating and mitigating factors before the jury, the PSI was but one item of evidence for the jury to consider. Within the ten-page PSI itself, the statement complained of appears only twice

amid abundant information about Evans, including his identifying information, institutional history, social history, education, prior record, parole and probation history, family history, employment history, physical and mental health, and financial situation. The report also contains victim impact statements and a description of the offense.

Given the jury's knowledge of the facts of the crime, the existence of uncontradicted evidence of aggravating circumstances, and the lack of any reference by the prosecution to the fact that Evans declined to be interviewed by the presentence investigator in 1984, we cannot say that Evans' decision not to be interviewed in 1984 influenced the sentence imposed in 1992. Upon our independent review of the record, we are satisfied beyond a reasonable doubt that if error was committed, it did not influence the jury's verdict.

## IV

In the course of the resentencing hearing, the State presented victim impact evidence consisting of the statements attached to the original PSI conducted in 1984, a separate statement from Susan Kennedy's father, John Kennedy, which had been partially redacted, and live testimony from Cheryl Piechowicz. Evans raises two challenges to the admission of this evidence. First, Evans contends that victim impact evidence cannot be considered by a jury in a capital sentencing proceeding because it is not listed under the enumerated aggravating circumstances in the death penalty statute, § 413 of Article 27. Second, Evans asserts that the victim impact evidence in this case, particularly Cheryl Piechowicz's statements about the repercussions of the murder of her sister and her husband, was "inflammatory" to the extent that it violated Evans' constitutional rights of due process. We find no merit to either contention.

## A

The constitutionality of victim impact evidence was recently affirmed by the Supreme Court in *Payne v. Tennes-*

*see,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). *Payne* concerned the brutal stabbing of a 28–year–old mother and her two children, ages two and three. The mother and two-year-old daughter died from the multiple wounds inflicted; Nicholas, the three-year-old son, survived the assault. At trial, the boy's grandmother took the stand and described how Nicholas had been affected by the murders of his mother and sister. The jury sentenced Payne to death on each of the murder counts. Payne challenged the sentence, contending that the admission of the victim impact evidence violated his Eighth Amendment rights under *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), a case in which the Supreme Court had held that victim impact testimony was inadmissible *per se.* The Supreme Court affirmed Payne's sentence, permitting the victim impact evidence and overruling *Booth v. Maryland.* The *Payne* Court noted that:

> "Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities . . . .
>
> . . . .
>
> . . . [T]here is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant."

*Id.* 501 U.S. at —, 111 S.Ct. at 2608–2609, 115 L.Ed.2d at 735–736. The Court therefore held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* at —, 111 S.Ct. at 2609, 115 L.Ed.2d at 736.

Evans acknowledges that the Maryland legislature has exercised its prerogative in this area and expressly required the preparation of victim impact statements and their consideration by the sentencing judge or jury in capital proceedings, *see* Md.Code (1957, 1992 Repl.Vol.), Art. 27, §§ 413(c)(1)(v),

643D; Md.Code (1957, 1993 Repl.Vol.), Art. 41, § 4–609(d),[7] but he contends that the structure of Article 27, § 413 is such that a sentencing body may consider no aggravating circumstances beyond those which are specifically enumerated in § 413(d). Specifically, Evans claims that the weighing of statutory aggravating and mitigating circumstances prescribed by § 413(h) precludes the jury's consideration of any other evidence.[8]

Evans' interpretation of § 413 is inconsistent with our previous analysis of victim impact evidence in capital cases. We examined the legislative intent of the provisions addressing victim impact statements at length in *Lodowski v. State,* 302 Md. 691, 490 A.2d 1228 (1985), *vacated on other grounds,* 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986). After analyzing the legislative history, we stated:

---

**7.** Md.Code (1957, 1992 Repl. Vol.), Art. 27, § 643D provides in relevant part:

"**§ 643D. Right of victim or representative of victim to address sentencing judge or jury.**

(a) *In general.*—In every case resulting in serious physical injury or death, the victim or a member of the victim's immediate family … may, at the request of the State's Attorney and in the discretion of the sentencing judge, address the sentencing judge or jury under oath or affirmation before the imposition of sentence."

Md.Code (1957, 1993 Repl. Vol.), Art. 41, § 4–609(d) provides:

"(d) In any case in which the death penalty or imprisonment for life without the possibility of parole is requested under Article 27, § 412, a presentence investigation, including a victim impact statement, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Article 27, § 412 or § 413."

**8.** Md.Code (1957, 1992 Repl. Vol., 1993 Cum.Supp.), Art. 27, § 413(h) provides:

"(h) *Weighing mitigating and aggravating circumstances.*—(1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the aggravating circumstances outweigh the mitigating circumstances.

(2) If it finds that the aggravating circumstances outweigh the mitigating circumstances, the sentence shall be death.

(3) If it finds that the aggravating circumstances do not outweigh the mitigating circumstances, a sentence of death may not be imposed."

"It is apparent that the legislature intended that victim impact statements be admissible in capital case sentencing proceedings. Furthermore, the legislature declared admissible '[a]ny other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements.' Art. 27, § 413(c)(1)(v)."

*Id.* at 738–739, 490 A.2d at 1252. We also recognized in *Lodowski* that "there is a reasonable nexus between the impact of the offense upon the victim or the victim's family and the facts and circumstances surrounding the crime especially as to the gravity or aggravating quality of the offense." *Id.* at 741–42, 490 A.2d at 1254. Thus, as the jury weighs the circumstances pursuant to § 413(h), victim impact evidence may "assist [the jury] in weighing the degree of harm that the defendant has caused and the corresponding degree of punishment that should be inflicted." *Booth v. Maryland,* 482 U.S. at 516, 107 S.Ct. at 2539, 96 L.Ed.2d at 456 (White, J., dissenting).

Because such evidence may be both relevant and probative, we concluded in *Lodowski* that " 'the impact of the crime on the victim ... can properly be included in the presentence report.' " 302 Md. at 742, 490 A.2d at 1254 (quoting *Sandvik v. State,* 564 P.2d 20, 23 (Alaska, 1977)). Furthermore, in light of the legislative history concerning victim impact evidence and the broad discretion vested in a sentencing judge, we also held that "the victim and other persons, may, in the discretion of the judge presiding at the sentencing stage of the trial, testify in open court concerning the impact the offense had on the victim and members of his family." *Id.* at 749, 490 A.2d at 1257.

Although our comments in *Lodowski* concerning victim impact evidence were *obiter dicta,* we have since adopted and relied upon that reasoning many times. *See, e.g., Grandison v. State, supra,* 305 Md. at 753–54, 506 A.2d at 614; *Bloodsworth v. State,* 307 Md. 164, 192, 512 A.2d 1056, 1070 (1986); *Booth v. State,* 306 Md. 172, 223, 507 A.2d 1098, 1124 (1986), *vacated in part,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440

(1987) (*Booth II* ). We see no reason why we should stray from our consistent interpretation of these statutes now.[9]

## B

■■■■ In support of his claim that the victim impact evidence, specifically Cheryl Piechowicz's testimony, violated his due process rights, Evans relies on *Payne v. Tennessee, supra*. *Payne* recognized that although there is no *per se* constitutional bar to the admission of victim impact evidence, there may be circumstances in which such testimony is so unduly prejudicial that it renders the trial fundamentally unfair. *Id.* 501 U.S. at ——, 111 S.Ct. at 2608, 115 L.Ed.2d at 735. Justice O'Connor, in her concurring opinion, referred to such evidence as "unduly inflammatory." *Id.* at ——, 111 S.Ct. at 2612, 115 L.Ed.2d at 739 (O'Connor, J., concurring).

The standard for what is "inflammatory" is not clearly defined in *Payne*, but it is clear that the evidence in question in *Payne* did not meet that standard. That statement consisted of the testimony of Nicholas' grandmother who, in describing the effect of the crime on Nicholas, testified:

"He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie."

*Id.* at ——, 111 S.Ct. at 2603, 115 L.Ed.2d at 728. Justice O'Connor characterized the effect of the evidence as follows:

---

**9.** During the four-year period in which *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (holding that the admission of victim impact evidence violated the Eighth Amendment) was in force, we did have occasion to vacate and remand sentences because of the use of victim impact evidence. *See, e.g., Harris v. State,* 312 Md. 225, 539 A.2d 637 (1988); *Hunt v. State,* 312 Md. 494, 540 A.2d 1125 (1988). Notwithstanding these cases, our interpretation of the Maryland legislative intent has remained consistent. Since *Booth v. Maryland* was overruled by *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), *Lodowski* and its progeny are once again controlling precedent.

"I do not doubt that the jurors were moved by this testimony—who would not have been? But surely this brief statement did not inflame their passions more than did the facts of the crime. . . . In light of the jury's unavoidable familiarity with the facts of Payne's vicious attack, I cannot conclude that the additional information provided by [the victim impact] testimony deprived petitioner of due process."

*Id.* at ——, 111 S.Ct. at 2612, 115 L.Ed.2d at 740 (O'Connor, J., concurring).

Cheryl Piechowicz's written victim impact statement in the case *sub judice* contained two statements to which Evans specifically excepted. Ms. Piechowicz wrote, "The realization that my sister is dead because of me is a living nightmare that taunts me constantly," and, referring to her daughter, "For a five-year-old to be put through this, I can only hope that time will help her forget." Like Justice O'Connor in *Payne,* we cannot conclude that these brief statements inflamed the passion of the jury more than did the facts of the crime. Here, the jury had been presented with evidence that Evans carefully planned his crime, patiently waited in the lobby of the hotel for his opportunity, calmly fired nineteen bullets with a MAC–11 machine pistol at Scott Piechowicz and Susan Kennedy, and used the proceeds of his crime to go shopping at a mall with his girlfriend later that evening. The jury had also been presented with the autopsy reports and photographs of Scott Piechowicz, depicting six gunshot wounds to the abdomen, and of Susan Kennedy, depicting four gunshot wounds to the chest. In light of the jury's extensive knowledge about the facts of these murders, we cannot say that the jury's additional knowledge about Cheryl Piechowicz's natural feelings of grief and guilt or about a young child's understandable trauma concerning the loss of her father deprived Evans of due process. *See Baker v. State,* 332 Md. 542, 632 A.2d 783 (1993).

## V

Consistent with his argument in the previous section that victim impact evidence should not be admitted, Evans

challenges the instructions to the jury concerning the use of victim impact evidence. In general, he claims that the trial court committed reversible error when it failed to instruct the jury that victim impact evidence is not an appropriate consideration in the imposition of a sentence. Evans specifically objected to the instruction actually given by the court and suggested two substitute instructions in its stead.

The court instructed the jury as follows:

"Now you have heard testimony and have received written statements of family members of David Scott Piechowicz and Susan Kennedy. This testimony and these statements are known as victim impact evidence and are intended to show each victim's uniqueness as a human being and the impact on the families of their loss.

"This evidence should be given whatever weight you feel it deserves. The victim impact evidence is not to be considered by you in determining whether the Defendant is a principal in the first degree.

"You are further instructed that this evidence is not to be taken as an aggravating circumstance in your deliberations. You may consider this evidence in determining, pursuant to my instructions and pursuant to the verdict form, whether the sentence shall be death or life imprisonment as to each victim."

Evans' counsel objected in relevant part as follows:

"Also, specifically, we take exception to the Court's instruction on victim impact and would urge the Court to substitute this, and I will read it into the record.

"Victim impact evidence has been submitted in this case. Victim impact evidence is designed to show each victim's uniqueness as an individual human being. It is not an aggravating circumstance and may not be used to weigh against mitigating factors.

"There is a second one, a follow-up. It has to do with victim impact, and I will read that into the record now.

"I further instruct you that victim impact is not a legal basis to impose the death penalty. It is not an aggravating

circumstance that you may consider within the framework of the sentencing form."

Maryland Rule 4–325(c) requires the court, at the request of a party, to instruct the jury as to the applicable law if the matter is not fairly covered by the instructions actually given.[10] In evaluating a trial judge's refusal to give a requested instruction,

> "we must determine whether the requested instruction constitutes a correct statement of the law; whether it is applicable under the facts and circumstances of this case; and whether it has been fairly covered in the instructions actually given."

*Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344, 1348 (1984). *See also Henry v. State, supra,* 324 Md. at 248–49, 596 A.2d at 1046 (quoting *Mack*); *Hunt v. State, supra,* 321 Md. at 442–43, 583 A.2d at 245 (same).

Applying this test to Evans' contentions, we find no merit to Evans' general claim that the jury should have been instructed that victim impact evidence is not an appropriate consideration in capital sentencing. We have just explained in Part IV, *supra,* that victim impact evidence *is* an appropriate consideration in capital sentencing. This contention fails the "correct statement of the law" prong of the test.

We also find no error in the sentencing judge's refusal to give Evans' two requested instructions on victim impact. The primary thrust of Evans' requested instructions is that victim impact evidence is not an aggravating circumstance within the framework of the sentencing form or the death penalty statute. In his instructions, the trial judge specifically told the jury that "this [victim impact] evidence is not to be taken as an aggravating circumstance in your deliberations." Clearly,

---

10. Md.Rule 4–325(c) provides:

"(c) How Given.—The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given."

the substance of Evans' requested instructions was fairly covered in the instructions actually given, and Evans' claim thus fails the third prong of the test.

## VI

 The trial court admitted into evidence several black and white autopsy photographs of the victims. Evans claims that the prejudice caused him by the photographs outweighed their probative value and that it was error to admit them into evidence.

In *Johnson v. State,* 303 Md. 487, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986), we considered the standard by which we should evaluate objections to the admission of photographic evidence and stated the following:

"We have consistently held that whether or not a photograph is of practical value in a case and admissible at trial is a matter best left to the sound discretion of the trial judge. *A court's determination in this area will not be disturbed unless plainly arbitrary....* On certain occasions, photographs have also been admitted to allow the jury to visualize the atrociousness of the crime—a circumstance of much import where the factfinder must determine the degree of murder."

303 Md. at 502, 495 A.2d at 8 (citations omitted) (emphasis added). *See also Bedford v. State, supra,* 317 Md. at 676, 566 A.2d at 119; *Harris v. State,* 312 Md. 225, 245, 539 A.2d 637, 647 (1988); *Mills v. State,* 310 Md. 33, 42–45, 527 A.2d 3, 7–8 (1987), *vacated on other grounds,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Grandison v. State, supra,* 305 Md. at 729–30, 506 A.2d at 602; [11] *Reid v. State,* 305 Md. 9, 20–21, 501 A.2d 436, 441–42 (1985).

 *Johnson* and many of the cases following it concerned photographs admitted during the guilt phase of the trial.

---

**11.** Interestingly, two of the photographs at issue in *Grandison* were black and white autopsy photographs of Scott Piechowicz and Susan Kennedy. We held in that case that the photographs were properly

Here, the photographs were admitted during the sentencing phase. In *Harris v. State, supra,* we recognized in *dicta* that "the standard for admissibility—probative value versus prejudicial effect—remains the same" in sentencing proceedings as in the trial on the merits. 312 Md. at 246, 539 A.2d at 647. We also recognized that the sentencing phase implicates issues different from those which predominate at the guilt phase of trial, and because of this, a judge should exercise his or her discretion with caution when ruling on the admissibility of photographic evidence in capital sentencing proceedings. *Id.* The need for caution, however, in no way circumscribes the judge's evidentiary authority; the admission of photographs into evidence remains soundly committed to the discretion of the trial judge in capital sentencing proceedings.

Applying this standard to the facts before us, we cannot say that the trial judge abused his discretion in allowing these photographs into evidence. The photographs illustrated the number of shots fired at each victim and the pattern of the victims' gunshot wounds. It is immaterial for this purpose that Evans had stipulated to the cause of death, location of wounds, etc., for "[t]he very purpose of photographic evidence is to clarify and communicate facts to the tribunal more accurately than by mere words." *Johnson v. State, supra,* 303 Md. at 503–04, 495 A.2d at 9. Moreover, the photographs could certainly assist the jury in visualizing the atrociousness of the crime, a circumstance which is no less important in the sentencing context than it is to a factfinder attempting to determine the degree of murder. In no way was the trial court's determination to admit the photographs "plainly arbitrary." Evans' contention, therefore, is meritless.

## VII

Evans next asserts that he was unfairly prejudiced by the fact that the jury had before it a docket entry from which

---

admitted. *Grandison v. State,* 305 Md. 685, 729–30, 506 A.2d 580, 602, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986).

it could deduce that the jury at the guilt/innocence phase of this capital proceeding deliberated for less than two hours before returning guilty verdicts. Evans claims that from this docket entry, the sentencing jury could presume that the guilt/innocence jury summarily rejected all of his defenses and that it should do likewise. In support of his assertion, he cites *Gore v. State,* 309 Md. 203, 522 A.2d 1338 (1987) and *Dempsey v. State,* 277 Md. 134, 355 A.2d 455 (1976). Neither case supports Evans' proposition, and we can discern no other support for this contention.

*Gore v. State* concerned a trial judge who, in response to defense counsel's assertion that the evidence was insufficient to find against the defendant on certain counts, told the jury that "the counts could never go to you if there were not evidence sufficient under the law." 309 Md. at 204, 522 A.2d at 1338. We held that the judge's comment was an indirect comment on the general weight of the evidence and outside the permissible scope of comment. *Id.* at 214, 522 A.2d at 1343. Evans' reliance upon *Dempsey v. State* is similarly misplaced. The issue in *Dempsey* was whether a confession was voluntarily given, and we held that it was improper for the trial judge to tell the jury that "the Court has found by a preponderance of the evidence that ... it was a voluntary statement in every regard." *Dempsey,* 277 Md. at 137, 355 A.2d at 457. Again, the error arose from the fact that the judge's comments to the jury revealed his opinion about a question of fact which was before the jury. *Id.* at 150, 355 A.2d at 463. The likelihood of prejudice in these cases arose from the fact that the judge occupies a high and authoritative position at the trial. Because of the esteem and respect rightfully accorded to the court, "if a judge makes a statement which shows his opinion of a question of fact which the jury is to pass on, it is very apt to make an impression on some, if not all, of the jurors...." *Dempsey,* 277 Md. at 149, 355 A.2d at 463 (quoting *Coffin v. Brown,* 94 Md. 190, 202–03, 50 A. 567, 572 (1901)).

In the case *sub judice,* Evans makes no allegation of improper comment by the judge or any other person occupy-

ing a position of authority. He alleges only that his sentencing jury was rendered incapable of fairly considering the evidence and the law and determining his sentence because of a docket entry from a trial which had occurred nine years earlier. We find no support for his contention, especially in light of the fact that, as we stated in Part VI, *supra*, the sentencing phase implicates issues different from those which predominate at the guilt/innocence phase of trial. To assume that a jury will be so influenced by the length of deliberation of a different jury considering different issues at a different time that it cannot fairly judge the evidence is to engage in pure, unbridled speculation.

## VIII

At the sentencing hearing, Evans requested that the judge instruct the jury as follows:

"You need not find any mitigating circumstance in order to impose a sentence of life imprisonment. Nothing in the law forbids you from extending mercy out of compassion or the belief that a life sentence is sufficient punishment under all of the circumstances.

However, you must note, in section four and section six [of the capital sentencing form], that you are relying on mercy or compassion for the Defendant as a mitigating circumstance and that this outweighs any aggravating circumstance."

As we noted in Part V, *supra*, when a party requests a jury instruction, the judge must give that instruction if the proposed instruction is an accurate statement of the law, *if it is applicable* to the facts and circumstances of the case at hand, and if the subject matter has not been fairly covered by other instructions given. Md.Rule 4–325(c); *Mack v. State, supra*. Evans' proposed mercy instruction is not an accurate statement of the law, and therefore it does not meet this test.

In *Scott v. State*, 310 Md. 277, 529 A.2d 340 (1987), we considered and rejected an instruction very similar to the first

paragraph of Evans' proposed instruction. The defendant in *Scott* requested that the following instruction be given:

"You need not find a mitigating circumstance in order to impose a sentence of life imprisonment. Nothing in the law forbids you from extending mercy out of compassion or belief that life imprisonment is sufficient punishment under all the circumstances."

*Scott v. State*, 310 Md. at 287, 529 A.2d at 344. The trial judge declined to give this instruction, and we held that there was no error in that decision, since

"[t]he instruction would inform the jurors that they need not find a mitigating circumstance in order to impose a sentence of life imprisonment. This conflicts with the statutory scheme which requires a jury to impose a death sentence when no mitigating circumstances are found if at least one aggravating factor has been established beyond a reasonable doubt."

*Id.* at 288–89, 529 A.2d at 345 (citation omitted).[12] Evans has attempted to cure the defect of the proposed instruction by adding his second paragraph and informing the jury that mercy must be considered within the weighing framework of § 413. He has not succeeded. It is true that mercy may be considered, and it is true that if it is considered, it must be within the weighing framework of § 413. Yet, notwithstanding the attempted cure, the first sentence of the proposed instruction would leave the jury with the impression that it need not find *any* mitigating circumstance in order to impose a sentence of life imprisonment. This proposed instruction is simply a misstatement of the law, and the trial judge did not err in refusing to give the instruction.

Moreover, the trial judge had instructed the jury that

---

**12.** Although Evans has not challenged the constitutionality of a sentencing scheme which requires the imposition of a sentence of death if no mitigating circumstances are established, we would note briefly that the Supreme Court expressly upheld a similar scheme in *Blystone v. Pennsylvania*, 494 U.S. 299, 305, 110 S.Ct. 1078, 1084, 108 L.Ed.2d 255, 263 (1990).

"If you perceive anything relating to the Defendant or the crime, which causes you to believe that death may not be appropriate, you may treat such factor as a mitigating circumstance and you may decide it outweighs the aggravating factor or factors."

Consequently, the court clearly indicated to the jury that if it was so inclined it could consider mercy as a mitigating circumstance in determining Evans' sentence.

## IX

 The gun used to murder Scott Piechowicz and Susan Kennedy was never recovered. At the guilt/innocence phase of the capital proceeding and at the sentencing phase of the proceeding, therefore, the State introduced as evidence a "mock-up" version of a MAC–11 machine pistol, the type of weapon thought to be used in the murder. Evans admits that the imitation weapon may have been admissible at the guilt phase of his trial, but he contends that the weapon is irrelevant to sentencing, and that it was therefore reversible error to admit the "mock-up" at his resentencing hearing.

In *Evans II, supra,* we held that it was not an abuse of discretion to admit a MAC–11 pistol which was representative of the actual weapon thought to be used in the murders. *Evans II, supra,* 304 Md. at 520–21, 499 A.2d at 1278–79. We noted in *Evans II* that

"[t]he relevance and materiality of the proffered exhibit, and the desirability of having a representative weapon . . . were apparent. . . . Tying the weapon offered to Evans, one day before the shooting, to the weapon used in the shooting, was clearly an important part of the State's case."

*Id.* at 521, 499 A.2d at 1278–79. The only significant difference between our earlier decision in *Evans II* and the question before us is the context in which it is presented. In the case *sub judice,* the replica of the murder weapon is no less relevant to sentencing than it was to the determination of guilt or innocence.

The Supreme Court has stated that a jury must determine whether a defendant should be sentenced to death based on "the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235, 251 (1983). The "circumstances" of a crime are broadly defined. In *Hunt v. State, supra*, we permitted the admission of demonstrative evidence consisting of the personal effects of the victim, including the victim's ballistic vest, police revolver, police uniform buttons, holster, gun belt, walkie talkie, and tie at a resentencing proceeding. *Hunt v. State*, 321 Md. at 424, 583 A.2d at 236. We determined that this evidence was relevant to Hunt's sentencing because it tended to establish an aggravating circumstance (i.e., that the victim was a police officer in the performance of his duties at the time of the murder) and to corroborate testimony about how the incident transpired. *Id.*

Certainly the type of weapon used in a murder is relevant to a circumstance of the crime, namely, the manner in which the victims were killed. In the absence of the actual weapon used, a "mock-up" or representative weapon will enhance the jury's understanding of that circumstance, as such demonstrative evidence can, like photographic evidence, "clarify and communicate facts to the tribunal more accurately than [can] mere words." *Bedford v. State, supra*, 317 Md. at 676, 566 A.2d at 119 (quoting *Johnson v. State, supra*, 303 Md. at 503–04, 495 A.2d at 9). The type of weapon used can also be probative of, among other things, the viciousness of the attack upon the murder victims. Certainly, this is an important factor for the jury to consider as it weighs aggravating and mitigating circumstances and determines whether to impose a sentence of death. We therefore reject Evans' contention and find no error in the admission of the "mock-up" of the MAC–11 machine pistol.

## X

Finally, pursuant to our duty under Art. 27, § 414(e), we find that the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We

further determine that sufficient evidence exists to support the jury's finding of aggravating circumstances, namely, that Evans committed the murder pursuant to an agreement or contract for remuneration, and that he committed more than one first-degree murder arising out of the same incident. Given the fact that one or more, but fewer than all 12, members of the jury found only one mitigating circumstance (i.e., drug influence), we hold that the evidence supports the jury's determination that the aggravating circumstances outweighed the mitigating circumstances.

*JUDGMENTS AFFIRMED.*

ROBERT M. BELL, Judge, dissenting.

## I.

The *voir dire* examination into prospective jurors' views concerning the death penalty was conducted on an individual basis. As pertinent to that inquiry, the petitioner asked the trial court to inquire whether "the fact that Vernon Evans has been convicted of two first degree murders in this case [would] cause you to automatically vote for the death penalty, regardless of the facts." This question, the petitioner argued, was required by *Morgan v. Illinois,* 504 U.S. ——, ——, 112 S.Ct. 2222, 2232, 119 L.Ed.2d 492, 505–06 (1992). The trial court refused the request; instead, it propounded the following questions [1]:

1. Do you feel or do you have any strong feeling one way or the other about the imposition of the death penalty?

2. Do you feel that your attitude, regarding the death penalty, would in any way prevent or substantially impair you from making a fair and impartial decision as to defendant's sentence in accordance with your oath as a juror,

---

[1] Not all of the venirepersons were asked these identical questions. Indeed, some of the venirepersons were asked the precise question which gives rise to this issue. The series of questions, however, reflect the typical examination of the venirepersons.

based upon the evidence presented in the court's instructions as to the law which is applicable?

3. After listening to the evidence and applying the law, if you were convinced that the appropriate sentence would be death, would you be able to vote for the death penalty?

4. On other hand, after listening to the evidence and applying the law, were you not convinced that the appropriate sentence should be death, but were convinced life was the appropriate sentence, would you vote for that alternative?

The appellant argues that these questions, none of which directly addresses the precise circumstances of his resentencing, were simply " 'general fairness' and 'follow the law' type questions asked by the trial court [which] inappropriately required the prospective jurors to make their own 'bottom line' determination as to whether their beliefs would conflict with unspecified 'instructions' and 'evidence.' " Appellant's brief at 10, citing *Bowie v. State,* 324 Md. 1, 595 A.2d 448 (1991). That being the case, and because no follow up questions to those broad inquiries were permitted, he asserts that jurors who would automatically vote for the death penalty under the circumstances of his case would never be discovered. The majority, on the other hand, rejects the appellant's argument and holds that the *voir dire* questions "were clearly sufficient for Evans and his counsel to determine whether prospective jurors were death-penalty dogmatists, and they were clearly sufficient to meet the standard enunciated in *Morgan v. Illinois, supra.*" Majority op. at 675.

I agree with the majority. I do not, however, accept some of the rationale underlying its holding.

I recently set forth, in detail, my views on the proper scope of *voir dire* examination in *Davis v. State,* 333 Md. 27, 55, 633 A.2d 867, 881 (1993) (Bell, J., dissenting). I believe now, as I did then, that

Under Maryland law it is clear that the focal point of *voir dire* is the trial judge. It is the trial judge that has responsibility for regulating and conducting *voir dire.* It is

the trial judge that controls the process; he or she determines: what questions to ask on *voir dire;* whether, and when, to allow counsel to ask follow up questions; and whether, and when, a prospective juror is dismissed for cause. It follows, therefore, that it is the trial judge that must decide whether, and when, cause for disqualification exists as to any particular venireperson. Neither the venire nor the individual venirepersons occupies such an important position.

*Id.* at 59, 653 A.2d at 883. In cases of this kind—when the issue is whether a prospective death penalty juror is predisposed for, or against, the death penalty—the critical inquiry is into the propriety of the trial court's exercise of discretion in determining whether the prospective juror is qualified to sit in that particular case. Ordinarily, as in the case *sub judice,* that inquiry involves a determination of the prospective juror's state of mind, *i.e.,* whether the juror is biased or prejudiced. This, in turn, is informed by how the juror views, and reacts to, the death penalty.

The United States Supreme Court has discussed, and explained, the nature of the trial court's decision-making relative to death penalty *voir dire.* In *Wainwright v. Witt,* 469 U.S. 412, 429, 105 S.Ct. 844, 855, 83 L.Ed.2d 841, 855 (1985), the Court observed, "[t]he trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be discerned from an appellate record." *See also Bowie,* 324 Md. at 22–23, 595 A.2d at 459 (to be sufficient, *voir dire* must be such that "the basis for the juror's conclusion and, therefore, for the court's ruling [is] apparent in the record"); *Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990); *Grandison v. State,* 305 Md. 685, 506 A.2d 580, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986). Thus, except when the venireperson admits an inability to be fair and impartial, the process necessarily must involve the trial judge asking questions designed to produce such factual information as may be relevant to the venireperson's bias. If it were otherwise, the defendant would be "completely at the

mercy of the good faith, objectivity, and astuteness of the individual venirepersons." *Davis,* 333 Md. at 63, 633 A.2d at 885 (Bell, J., dissenting).

The question proffered by the appellant would result in automatic disqualification were a prospective juror to answer it in the affirmative. Hence, as this Court indicated in *Davis,* 333 Md. at 34, 633 A.2d at 871, to be proper *voir dire,* it must be directly related to juror disqualification. Under *Davis,* therefore, the proffered question would appear to be a proper *voir dire* question, and the trial court's refusal to ask that question could very well be found to be an abuse of discretion. *See* 333 Md. at 34, 633 A.2d at 871. Nevertheless, I do not believe that is an abuse of discretion in this case.

First of all, as the majority points out, the series of questions which the venire was asked were sufficient to permit the trial court to determine whether a prospective juror was biased or prejudiced to the point where he or she could not render a fair and impartial capital sentencing verdict. To be sure, the information *voir dire* elicited did not focus on identifying which side of the death penalty issue may have caused the prospective juror's apprehension or bias; the purpose of eliciting the information was only to identify its effect from that juror's perspective. And the fact that the *voir dire* was conducted on an individual basis, requiring the prospective juror to answer each of the questions, permitted the trial court to assess each juror's credibility on the basis of factors that could not be discerned from the appellate record. *See Witt,* 469 U.S. at 429, 105 S.Ct. at 855, 83 L.Ed.2d at 855. Moreover, notwithstanding that the prospective jurors were not given the opportunity to respond to a question which directed their attention to the specific facts on which the sentence must be predicated, the *voir dire* questions asked, taken cumulatively, required each prospective juror to come to grips with the issue which the question proposed by the appellant addressed; each had to consider whether he or she would act automatically or only after considering all relevant issues and facts.

The *voir dire* procedure in the case *sub judice* is by no means equivalent to that employed in *Bowie*. There, the inquiry into the venire's views concerning the death penalty was addressed to the group. Thus, the court never considered any individual venireperson's qualifications to serve on a death penalty jury. The single question on the subject put to the venire, although it did not identify any cause for the prospective jurors' conclusion that they could not be fair or impartial, resulted in disqualification of all who answered in the affirmative.

I cannot agree with the majority, however, that "[t]he specific circumstances of a particular crime are irrelevant to one's pre-existing bias or predisposition and thus cannot be factored into the court's evaluation of a jury's ability to judge impartially," majority op. at 675, or that, because it encompasses "an important aggravating factor" for the jury to consider, *id.*, the inquiry proposed by the appellant is beyond the scope of *voir dire* because it seeks "advance clues from prospective jurors as to how they would vote on the facts of the case." *Id.* Neither of these contentions is correct. Bias cannot be assessed in a vacuum. Thus, the facts of the case in which the juror will sit must be known if that juror's bias is to be assessed in any meaningful way. It is for that reason that, consistent with the usual practice, the trial court provided a brief synopsis of the pertinent facts prior to beginning jury selection. In other words, the facts of the case to be tried are quite relevant to jury selection. Consequently, *voir dire* questions which include relevant facts about the case tend to assure that prospective jurors will be impartial—precisely what the *voir dire* process is designed to accomplish.

To be sure, the court would not have erred had it asked the precise question proposed by the appellant because there is no more direct, nor effective way of inquiring into a prospective juror's bias than to ask that juror, plainly and without equivocation, referencing the facts of the case, whether he or she could be fair. This is true whether or not the facts of the case would reveal aggravating circumstances which the jury must take into account to fulfill its function under the death penalty

statute. Consequently, while it may not have been an abuse of discretion in this case to have refused to make the inquiry proposed, it certainly is not beyond the scope of proper *voir dire*, or irrelevant to one's pre-existing bias or predisposition. In fact, under this Court's opinion in *Davis*, because it is extremely relevant, it is precisely the kind of question that ought to be asked on *voir dire*. *See Davis*, 333 Md. at 34, 633 A.2d at 871.

## II.

I find merit in the appellant's argument that the prosecutor's reference, in closing argument, without evidentiary support in the trial record, to a prisoner who escaped from a maximum security prison while serving a life sentence was prejudicial error. The appellant maintains that the remarks were unduly prejudicial because they suggested to the jury that the appellant would likely escape and, thus, be a danger to society were he sentenced to life imprisonment, rather than death.

The scope of closing argument is a matter addressed to the sound discretion of the trial court. *Booth v. State*, 327 Md. 142, 193, 608 A.2d 162, 197, *cert. denied,* —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992); *Thomas v. State*, 301 Md. 294, 316, 483 A.2d 6, 17 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985). Because discretion can be abused, the scope of closing argument is not without limits, *Booth,* 327 Md. at 193, 608 A.2d at 187; *Henry v. State*, 324 Md. 204, 230–31, 596 A.2d 1024, 1037 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 307 (1992); *Jones v. State*, 310 Md. 569, 580, 530 A.2d 743, 748–49, *sentence vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988), *sentence vacated and remanded,* 314 Md. 111, 549 A.2d 17 (1988); *Poole v. State*, 295 Md. 167, 191, 453 A.2d 1218, 1231 (1983); *Wilhelm,* 272 Md. at 415, 326 A.2d at 715–16, one of which is that a prosecutor generally cannot refer to matters not in evidence. *Jones,* 310 Md. at 580, 530 A.2d at 748. When the prosecutor does refer to matters not in evidence, reversal is required where those comments actually

mislead or influence the jury to the prejudice of the accused. *Booth,* 327 Md. at 193, 608 A.2d at 187; *Jones,* 310 Md. at 580, 530 A.2d at 748; *Wilhelm,* 272 Md. at 415, 326 A.2d at 715–16; *Wood v. State,* 192 Md. 643, 652, 65 A.2d 316, 320 (1949); *Reidy v. State,* 8 Md.App. 169, 172, 259 A.2d 66, 67–68 (1969). As Chief Judge Murphy (then Chief Judge of the Court of Special Appeals) explained it:

> It is fundamental to a fair trial that the prosecutor should make no remarks calculated to unfairly prejudice the jury against the defendant. *Meno v. State,* 117 Md. 435 [, 83 A. 759 (1912) ]; *Holbrook v. State,* 6 Md.App. 265 [250 A.2d 904 (1969) ]. And it is unquestionably wrong for the prosecutor in his argument to the jury to refer to any matter not testified to by the witness or disclosed by the evidence in the case. *Toomer v. State,* 112 Md. 285 [, 76 A. 118 (1910) ]. On the other hand, the fact that a remark made by the prosecutor in argument to the jury was improper does not necessarily compel that the conviction be set aside. *Conway v. State,* 7 Md.App. 400 [, 256 A.2d 178 (1969) ]. The Maryland Rule is that unless it appears the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused by the remarks of the State's Attorney, reversal of the conviction on this ground would not be justified. *Wood v. State,* 192 Md. 643 [65 A.2d 316 (1949) ]; *Holbrook v. State, supra.*

8 Md.App. at 172, 259 A.2d at 67–68. This is consistent with the rule which is followed in the federal courts. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (reversal required where the prosecution's remarks are focused, unambiguous, and strong to the point of depriving the accused of fundamental fairness). *See also Donnelly v. De-Christoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

A closing argument is prejudicial to the defendant when, considering the closeness of the case, the centrality of the issue affected by the error and the steps the court took to mitigate the effects of the error, the reviewing court cannot say " 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that

the judgment was not substantially swayed by the error.'" *Wilhelm,* 272 Md. at 416, 326 A.2d at 716, quoting *Gaither v. U.S.,* 413 F.2d 1061, 1079 (D.C.Cir.1969), quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566–67 (1946). Applying this test, we have declared prejudicial a prosecutor's closing argument calling attention to a criminal defendant's right to appeal, *Johnson v. State,* 325 Md. 511, 517–18, 601 A.2d 1093, 1096 (1992), and, in a capital sentencing proceeding, a prosecutor's reference to the possibility of parole. *See Poole,* 295 Md. at 196, 453 A.2d at 1233. *See also Contee v. State,* 223 Md. 575, 584, 165 A.2d 889, 894–95 (1960) (remarks reasonably calculated to appeal to racial prejudices); *Cicero v. State,* 200 Md. 614, 620–21, 92 A.2d 567, 570 (1952); *Apple v. State,* 190 Md. 661, 666–67, 59 A.2d 509, 511 (1948); *Riggins v. State,* 125 Md. 165, 174, 93 A. 437, 440 (1915) (all holding that it is improper for prosecutor to assert belief or personal conviction as to the accused's guilt).

In the case *sub judice,* the majority rejects the appellant's argument on two bases. First, it holds that the prosecutor in closing argument "is provided a wide range", *Henry,* 324 Md. at 230–31, 596 A.2d at 1037, and, in this case, that range was not exceeded. Secondly, the majority asserts that, even if the remarks were improper, the error was harmless. I find neither justification to have merit.

The majority's position, simply stated is, "it is proper for counsel to argue to the jury—even though evidence of such facts has not been formally introduced—matters of common knowledge or matters of which the court can take judicial notice." Majority opinion at 679, quoting *Wilhelm,* 272 Md. at 438, 326 A.2d at 728. That may be so; however, that principle does not permit the State's Attorney to evade the principle of relevancy applicable to criminal trials. In other words, while the prosecutor may refer to matters of common knowledge without laying an evidentiary foundation, that is true only if those matters are relevant to the issue before the court. In this case, because that is the only basis upon which it has any conceivable relevance to the appellant's sentencing, Mr. Dean's escape was offered to prove that the appellant, who

would be a lifer should the jury opt for life imprisonment, would also escape from prison. But, without more, evidence of Dean's escape, however much it might be a matter of common knowledge, simply was not admissible in the sentencing proceeding; it simply was not relevant to the issue before the jury. It did not contradict the appellant's expert evidence and it did not provide any nexus between the escape and the appropriate sentence for the appellant, other than the fact that if the jury sentenced the appellant to life, they both would be "lifers."

The appellant's expert witness acknowledged that there were exceptions to the rule that "lifers" tended to make a better adjustment to prison life than other prisoners. Thus, the reference to Dean could not have been to contradict the witness. On the other hand, to be relevant, there must have been evidence which would have established a connection between the Dean escape and the potential for escape by the appellant.

Other than that they would both serve life sentences, no attempt was made to establish a correlation, close or otherwise, between the two. Indeed, rather than availing himself of the opportunity to question the appellant's expert witness concerning admitted exceptions to his theory that "lifers" generally adjust well to long term imprisonment, the prosecutor waited until closing argument to bring to the jury's attention Mr. Dean's escape, no doubt in the hope of causing it to infer that the appellant, too, would escape. The reason for choosing closing argument as the appropriate point to raise the subject no doubt was calculated to obtain the most profound impact on the jury which was being asked to choose between whether the appellant should live or die.[2] Given the

---

2. By waiting to raise the issue until closing argument, the State avoided the possibility that the appellant would be able to respond effectively to it and show it to be a misstatement of fact, a situation not totally to be ignored. In an exchange between the prosecutor and the appellant's expert witness, the following occurred:

Q. [State's Attorney] Let me get you to (1) that you did study. Jackie [sic] Harris remember that name?

timing of the argument, it seems apparent that the State's Attorney saw advantage in making the argument without developing the evidentiary predicate; without it, the jury would probably draw the apparently logical, if improper, inference. More to the point, the reference to Mr. Dean's escape was irrelevant without a showing that it was probative of a characteristic or tendency of the appellant, demonstrated by the record, and that persons with that characteristic were more likely than not to escape. No such showing was made. It was error, therefore, for the trial court to have allowed the prosecutor's improper closing argument referencing the Dean escape.

Moreover, the error was prejudicial and, thus, far from harmless. The test of harmless error applicable in this state is the one enunciated in *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976):

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—

---

A. Yes.
Q. You testified on his behalf, did you not?
A. Yes.
Q. He was a lifer?
A. Yes.
Q. And Jackie [sic] Harris, it is true, is it not, on an occasion, with two other either long-termers or lifers attempted an escape and held several correctional officers in custody?
A. Actually now, this is an interesting case-
Q. Answer my question first and I will give you a chance.
A. He wasn't a lifer at that time. He was under a death sentence. That occurred eight years before I interviewed him. The important point is that certainly had I met him back in, I think it was '81, after involved in this violent escape statement, I would be reasonably confident that he did not fit this adjustment. But some seven, eight years later he compiled a remarkably good prison adjustment.

may have contributed to the rendition of the guilty verdict. (footnote omitted).

Harmless error analysis is intended to be strict, that is, it "has been and should be carefully circumscribed." *Younie v. State,* 272 Md. 233, 248, 322 A.2d 211, 219 (1974). This is so because of the effect were it to be otherwise applied. *See id.,* in which we explained that effect (quoting *People v. Jablonski,* 38 Mich.App. 33, 195 N.W.2d 777, 780 (1972)):

"Continued expansion of the harmless error rule will merely encourage prosecutors to attempt to get such testimony in, since they know that, if they have a strong case, such testimony will not be considered reversible error, yet if they have a weak case, they will use such testimony to buttress the case to gain a conviction and hope that the issue is not raised on appeal."

The harmless error test therefore, does not equate to an "otherwise sufficient" test. *See Rubin v. State,* 325 Md. 552, 592–93, 602 A.2d 677, 696–97 (1992) (Bell, J., dissenting).

The critical issue before the court was whether the appellant should receive the death penalty or life imprisonment. That decision, necessarily a subjective one, depends very heavily upon the facts and circumstances, not only of the case, but also on whether the jury views the appellant as potentially dangerous. The prosecutor's remarks in closing argument had no purpose other than to influence the jury to believe that the appellant was a danger to escape and thereby caused the jury to opt for death as opposed to life imprisonment. The only basis for the argument, however, was the fact that Mr. Dean, another "lifer," had previously escaped.

It is the notoriety that the escape occasioned and the closeness in time to the trial of the appellant that take on significance and color the inference the jury is being asked to draw. In point of fact, it is clear beyond cavil that it was the fact of the notoriety that prompted the State's Attorney to appeal to the jury to draw the inference that, if given a life sentence and even if placed in a "Super Max" facility, the appellant, like Dean, would escape. Furthermore, the situa-

tion is aggravated by the fact that the evidence concerning Dean was inadmissible. As the appellant points out, the *Dean* case was a separate and distinct case, proof of which could not have been introduced in his case as substantive evidence. On the other hand, the fact that Dean escaped could have been introduced to impeach the appellant's expert witness if it contradicted that witness's testimony. As it was noted earlier, the appellant's expert witness did not purport to state a general, inflexible rule; rather, he acknowledged that there were exceptions. Thus, the evidence concerning Dean's escape was not contradictory of the appellant's evidence at all. Of course the trial court, perceiving no error, took no steps to mitigate its effects. Certainly, the mere fact that the trial court advised the jury that opening statements and closing arguments of counsel are not evidence is not sufficient, in and of itself, to have ameliorated the prejudicial effect of the argument.[3] The error was not harmless beyond a reasonable doubt, and, therefore, the death sentence must be vacated and, a new capital sentencing hearing ordered.

### III.

The appellant refused to discuss the offenses with the probation agent who prepared the presentencing investigation report. That fact was mentioned in the PSI report on two separate occasions. The appellant sought to have those two references redacted from the report. The trial court refused, thus giving rise to this issue.

I agree with the appellant that his right against self-incrimination extends to capital sentencing, *see Estelle v. Smith*, 451 U.S. 454, 462–63, 101 S.Ct. 1866, 1872–73, 68 L.Ed.2d 359, 368–69 (1981), and that it was error for the court to refuse to redact references to the appellant's election not to

---

**3.** The majority refers to the trial court's instructions concerning opening and closing arguments as being "curative." These instructions were not given in response to the prosecutor's ill advised argument; rather, they were given as a part of the court's usual instructions. Thus, it is a misnomer to call those instructions "curative."

discuss the offenses with the probation agent. Like the trial judge, who did not dispute the premise upon which the appellant proceeded, the majority deems any error in that regard to be harmless beyond a reasonable doubt. With that proposition I strongly disagree.

The majority's harmless error analysis is as follows:

Given the jury's knowledge of the facts of the crime, the existence of uncontradicted evidence of aggravating circumstances, and the lack of any reference by the prosecutor to the fact that Evans declined to be interviewed by the presentence investigator in 1984, we cannot say that Evans' decision not to be interviewed in 1984 influenced the sentence imposed in 1992. Upon our independent review of the record, we are satisfied beyond a reasonable doubt that if error was committed, it did not influence the jury's verdict.

Majority opinion at 692–694. As a predicate to that analysis, the majority noted the fact that the PSI was but one item of evidence, among all of the evidence concerning aggravating and mitigating facts and that the two statements were a part of a ten page PSI report. Having determined that the evidence was otherwise sufficient to support the jury's death penalty sentence, the majority has simply found a way to rationalize affirmance of that decision. I was not aware that whether evidence is prejudicial depends upon how the State chooses to use the evidence. I gather from the majority opinion that, had the State's Attorney commented on the appellant's election not to discuss the offense with the probation agent, that the error may very well have been harmful. Nor was I aware that it is the quantity, rather than the quality, of the evidence, that is dispositive. The majority, however, makes much of the fact that there were only two references to the appellant's decision not to discuss the offense amid a mass of other evidence available for the jury's review. Under the majority's view of the matter, rarely could there be harmless error no matter how prejudicial the reference; if the reference is brief and is not otherwise commented upon by the State, it would be unable to say that the reference contributed

to the verdict. That is an even more expansive application of the harmless error rule than that utilized in *Rubin.*

I am persuaded by the appellant's very logical and persuasive argument:

A substantial argument in favor of mitigation was remorse. In his allocution appellant conceded that the crime was "hideous" but also insisted that he was "truly sorry" for having been involved in the crime. The problem is that this jury had before it the statement that in June, 1984, appellant had declined to talk to the presentence investigator. From this, the jury could conclude that appellant's alleged remorse, at best, of recent vintage and entitled to little weight. In some circumstances, this reasoning would be justified. However, in this case, such a conclusion penalizes appellant for exercising his right against self-incrimination and is therefore improper.

Appellant's Brief at 21.

## IV.

In *Payne v. Tennessee,* 501 U.S. 808, ——, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 (1991), the Supreme Court held "that if a state chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar," no more and no less. *See* 501 U.S. at ——, 111 S.Ct. at 2612, 115 L.Ed.2d at 739–40 (O'Connor, J., concurring) ("we hold merely that if a state decides to permit consideration of this evidence, 'the Eighth Amendment erects no *per se* bar.' "). While it also noted that "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed," the Court observed that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the due process clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at ——, 111 S.Ct. at 2608, 115 L.Ed.2d at 735.

The determination whether the admission of victim impact evidence in a capital sentencing procedure offends due process involves an analysis of whether its introduction will cause the proceedings to be fundamentally unfair. This, in turn, involves a consideration of the impact of that evidence on the exercise of discretion by the trier of fact. It is, of course, now well settled that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must suitably be directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859, 883 (1976). *See Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Whether the fact finder's discretion is suitably directed and limited necessarily must depend upon the purpose for which the evidence is offered and its relevance to the issue to be decided, that is, whether it is admitted for a legitimate purpose and it actually performs that purpose.

Concerning victim impact evidence, the *Payne* Court stated that "[i]t is designed to show ... *each* victim's 'uniqueness as an individual or human being,' whatever the jury might think the loss to the community resulting from his death might be." 501 U.S. at ——, 111 S.Ct. at 2607, 115 L.Ed.2d at 734. Stated differently, the Court indicated "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Id.* at ——, 111 S.Ct. at 2608, 115 L.Ed.2d at 735. Thus, extrapolating from these comments, it is clear that if victim impact evidence is intended to, and does, inform the sentencing authority about the specific harm caused by the crime in question, it is admissible at a capital sentencing proceeding. The *Payne* Court found the testimony of the mother of one of the victims to fall within that definition.[4] It is significant, however, that *Payne* did not character-

---

**4.** The testimony concerned how the surviving victims was affected by the murder of his mother and sister. That testimony was:

ize victim impact evidence as an aggravating circumstance, available to be weighed against any mitigating circumstance the appellant might produce or to be used in determining his fate. 501 U.S. at ——, 111 S.Ct. at 2608, 115 L.Ed.2d at 735 ("In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the due process clause of the Fourteenth Amendment provides a mechanism for relief.").

The appellant argues that admission of the victim impact evidence in the case *sub judice,* consisting of oral testimony and statements in the PSI report, is violative of the due process clause of the Fourteenth Amendment. He maintains that it creates an unacceptable risk of the death penalty being imposed on an arbitrary and capricious basis, *i.e.* emotion, rather than upon an objective weighing of aggravating and mitigating factors under the constitutionally mandated sentencing scheme. I agree.

While it is acceptable to produce evidence "informing the sentencing authority about the specific harm caused by the crime in question," the victim impact evidence adduced in this case goes beyond that. It focuses exclusively on the emotional impact of the crime on the victim's family and, therefore, it is constitutionally irrelevant. *See* 501 U.S. at ——, 111 S.Ct. at 2626, 115 L.Ed.2d at 756–57 (Stevens, J., dissenting). Moreover, because it necessarily shifts the attention of the fact finder from the culpability of the defendant, the focus of the sentencing scheme promulgated by the Maryland Legislature, *see* Maryland Code (1957, 1992 Repl. Vol.) Art. 27, § 413; Md. Rule 4–343, to the character of the victim and grief of his or her survivors, with the very real "possibility that the jury will be so distracted by '[those]' prejudicial and irrelevant considerations that it will base its life-or-death decision on whim or caprice." *Payne,* 501 U.S. at ——, 111 S.Ct. at 2630, 115

---

He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, grandmomma, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie.

L.Ed.2d at 761 (Stevens, J., dissenting), quoting *Booth v. Maryland*, 482 U.S. 496, 506–07, 107 S.Ct. 2529, 2534–35, 96 L.Ed.2d 440, 450–51 (1987).

Rather than address the substantive issue, the majority, in effect, holds that, if error, the admission of the victim impact evidence was, in any event, harmless beyond a reasonable doubt:

> In light of the jury's extensive knowledge about the facts of these murders, we cannot say that the jury's additional knowledge about Cheryl Piechowicz's natural feelings of grief and guilt or about a young child's understandable trauma concerning the loss of her father deprived Evans of due process.

Majority Opinion at 699. In reaching this conclusion, it referred to the victim impact evidence in *Payne*, which, it noted, Justice O'Connor, in her concurring opinion, determined "did not inflame [the jury's] passions more than did the facts of the crime, due to its briefness and the jury's unavoidable familiarity with the facts of the crime." *Payne*, 501 U.S. at ——, 107 S.Ct. at 2612, 115 L.Ed.2d at 740 (O'Connor, J., concurring).

I cannot agree with that conclusion. First of all, it is not possible meaningfully to assess the impact of evidence on a jury in one case by reference to the impact of similar evidence on another jury in another case. In other words, that evidence in one case did not affect that jury's death penalty decision, *ipso facto*, does not mean that evidence, which, on the surface may appear comparable, would not, or cannot, prejudicially impact a different jury charged with making the same decision. Furthermore, as already indicated, *see* part III, *supra*, it is at best simplistic to assume that, because a reference to one type of evidence in a trial is brief and the references to other evidence in the case are extensive, that the former can never have any impact on the trier of fact. Indeed, there are examples in which this Court has taken the opposite position. *See, e.g., State v. Enriquez*, 327 Md. 365, 374, 609 A.2d 343, 347 (1992); *Johnson v. State*, 325 Md. 511,

522, 601 A.2d 1093, 1097-98 (1992); *Bowie v. State*, 324 Md. 1, 11, 595 A.2d 448, 452 (1991); *Hook v. State*, 315 Md. 25, 42, 553 A.2d 233, 242 (1989). More important than the quantity of the evidence or the number of the references is the quality of the evidence; the subject of the reference, and, in context, its potential significance on the decision the jury is called upon to make are much more likely to be dispositive.

The majority's analysis does away with the need ever to address the due process concerns of victim impact evidence; whenever the victim impact evidence is brief and the facts of the case extreme, under the majority's view, victim impact evidence is always admissible because it could not impact upon the fact finder's decision. No matter how heinous the crime, it is the call of the trier of fact whether, in light of all the circumstances, the death penalty is justified. However heinous the crime, death may be imposed only after aggravating factors have been weighed against mitigating factors and found to outweigh those factors. It is not the law of Maryland that a sentence of death may be imposed, as a matter of law, whenever the circumstances of the crime reveal that it was perpetrated in a vicious and brutal fashion. But that is the effect of the majority's harmless error analysis. As Mr. Justice Marshall aptly pointed out, referring to the victim impact evidence in *Payne* and the Tennessee Supreme Court's "harmless error analysis," it is necessary to "address how the victim-impact evidence introduced during the sentencing proceedings in this case likely affected the jury's determination that the balance of aggravating and mitigating circumstances dictated a death sentence." *Payne*, 501 U.S. at —— n. 4, 111 S.Ct. at 2625 n. 4, 115 L.Ed.2d at 755 n. 4 (Marshall, J., dissenting). Where, he continued, "in the penalty phase the only evidence introduced by the State, other than some evidence of the circumstances of the crime, is the victim impact evidence, it is simply impossible to conclude that this victim-impact testimony ... was harmless beyond a reasonable doubt." *Id.*

## V.

The trial court instructed the jury:

Now you have heard testimony and have received written statements of family members of David Scott Piechowicz and Susan Kennedy. This testimony and these statements are known as victim impact evidence and are intended to show each victim's uniqueness as a human being and the impact on the families of their loss.

This evidence should be given whatever weight you feel it deserves. The victim impact evidence is not to be considered by you in determining whether the defendant is a principal in the first degree.

You are further instructed that this evidence is not to be taken as an aggravating circumstance in your deliberation. You may consider this evidence in determining, pursuant to my instructions and pursuant to the verdict from, whether the sentence shall be death or life imprisonment as to each victim.

Presumably, the predicate for these instructions was Maryland Code (1957, 1990 Repl. Vol.), Art. 41, § 4–609(d), which provides:

In any case in which the death penalty or life imprisonment without the possibility of parole is requested under Art. 27, § 412, a presentence investigation, including a victim impact statement, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted under Art. 27, § 412 or § 413.

*See also* Maryland Code (1957, 1992 Repl. Vol.), Art. 27, § 643D, which permits the trial court, on request of the State's attorney, to permit oral victim impact evidence.

The appellant objected to the court's instructions. He stated:

Also, specifically, we take exception to this court's instruction on victim impact and we urge the court to substitute this, and I will read it into the record.

"Victim impact evidence has been submitted in this case. Victim impact evidence is designed to show each victim's uniqueness as an individual human being. It is not an aggravating circumstance and may not be used to weigh against mitigating factors."

There is a second one, a follow up. It has to do with victim impact and I will read that into the record now.

"I further instruct you that victim impact is not a legal basis to impose the death penalty. It is not an aggravating circumstance that you may consider within the framework of the sentencing form."

The appellant's exception and proffered instructions appear to be premised on Maryland Code (1957, 1992 Repl. Vol., 1993 Cum.Supp.) Art. 27, § 413(h), which provides:

*Weighing mitigating and aggravating circumstances.*—(1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the aggravating circumstances outweigh the mitigating circumstances.

(2) If it finds that the aggravating circumstances outweigh the mitigating circumstances, the sentence shall be death.

(3) If it finds that the aggravating circumstances do not outweigh the mitigating circumstances, a sentence of death may not be imposed,

and on the fact that § 413(d), which enumerates the aggravating circumstances, does not refer to victim impact evidence. The appellant argues that, had the General Assembly so intended, it would have specifically mentioned victim impact evidence in § 413(d); thus, its absence clearly indicates the Legislature's restriction of the section to those aggravating circumstances enumerated. The appellant also does not believe that the requirement in Art. 41, § 609(d) that the trier of fact consider presentence investigations, including victim impact evidence, is a sufficient basis upon which to conclude, as the trial court apparently did, that, in giving victim impact evidence "whatever weight you feel it deserves," the jury could consider such evidence "in determining . . . whether the

sentence shall be death or life imprisonment as to each victim."

In interpreting a statute's provisions, our goal is to ascertain and effectuate the intention of the legislature. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513, 525 A.2d 628, 632 (1987). Our focus is, therefore, centered upon the statute's purpose or policy. *Mustafa v. State*, 323 Md. 65, 73, 591 A.2d. 481, 484–85 (1991). Where the statutory language is unambiguous, and clearly consistent with the statute's apparent purpose, the words will be accorded their ordinary meaning. *Mustafa, supra; Trimble v. State*, 321 Md. 248, 265, 582 A.2d 794, 802 (1990). If a statute is susceptible of more than one construction, it should be given that construction which will effectuate or carry out its purpose or object, and adopt that construction which avoids an illogical and unreasonable result, or one which is inconsistent with common sense, *Kaczorowski*, 309 Md. at 513, 525 A.2d at 632, but not a construction that would do more than effect the legislative object or purpose. *Harbor Island Marina, Inc. v. Board of County Com'rs of Calvert County*, 286 Md. 303, 311, 407 A.2d 738, 742 (1979); *Smith v. Higinbothom*, 187 Md. 115, 125, 48 A.2d 754, 759 (1946). This is especially true when a court is construing a penal statute. Penal statutes are to be strictly construed, i.e., in favor of the accused, and against the State. *State v. Fabritz*, 276 Md. 416, 422, 348 A.2d 275, 279 (1975), *cert. denied*, 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976); *Wanzer v. State*, 202 Md. 601, 611, 97 A.2d 914, 918 (1953); *Weinecke v. State*, 188 Md. 172, 176, 52 A.2d 73, 74 (1947); *State v. Flemming*, 173 Md. 192, 195 A.392 (1937); *Ruth v. State*, 20 Md. 436 (1864).

Section 413(h) does require the jury to weigh the statutory aggravating and mitigating circumstances to determine the sentence. *See, e.g., Thanos v. State*, 330 Md. 77, 83, 622 A.2d 727, 729 (1993); *Woodson v. State*, 325 Md. 251, 267–68, 600 A.2d 420, 428 (1992); *White v. State*, 322 Md. 738, 745, 589 A.2d 969, 972 (1991); *Collins v. State*, 318 Md. 269, 296, 568 A.2d 1, 14, *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990); *Harris v. State*, 312 Md. 225, 256, 539

A.2d 637, 650 (1988); *Scott v. State,* 310 Md. 277, 287, 529 A.2d 340, 345 (1987); *State v. Calhoun,* 306 Md. 692, 739–40, 511 A.2d 461, 485 (1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987). In fact, the determination of the jury shall state, specifically:

(1) Which, if any, aggravating circumstances it finds to exist;

(2) Which, if any, mitigating circumstances it finds to exist;

(3) Whether any aggravating circumstances found under subsection (d) outweigh the mitigating circumstances found under subsection (g) of this section;

(4) Whether the aggravating circumstances found under subsection (d) do not outweigh mitigating circumstances under subsection (g); and

(5) The sentence, determined in accordance with subsection (f) and (h).

Art. 27, § 413(j)(1)–(5). The sentence must be life unless the State proves by a preponderance of the evidence that the statutory aggravating circumstances outweigh the mitigating circumstances. *White,* 322 Md. at 745, 589 A.2d at 972; *Harris,* 312 Md. at 256, 539 A.2d at 650; *Scott,* 310 Md. at 284, 529 A.2d at 343.

It seems clear that, in the absence of Art. 41, § 609(d), victim impact evidence would not be admissible, not to mention considered, in a capital sentencing procedure. By its enactment, this issue is at the least confused. There is some question as to whether section 609(d) requires the trier of fact to consider the presentence investigation report, and not specifically the victim impact evidence, even though such evidence is required to be made a part of the report. But, in any event, by not amending section 413(d), the Legislature has left unclear just what role victim impact evidence plays in the death penalty decision. That being the case, and this being a capital case, the doubt must be resolved in favor of the appellant and against the State.

The subject jury instruction permits victim impact evidence to be equated with a statutory aggravating circumstance un-

der § 413(d) and, in reality, to take on the aspect of a super aggravating factor. *See Collins,* 318 Md. at 296, 568 A.2d at 14; *see also Calhoun,* 306 Md. at 739–40, 511 A.2d at 485. Under that instruction, the court clearly sought to permit the jury to treat victim impact evidence as an aggravating factor sufficient to impose the death penalty. Because, however, *Payne* does not characterize such evidence as an aggravating circumstance and, in any event, there is no statutory aggravating factor into which such evidence comfortably fits, it actually licenses the jury to trump the mitigating evidence with victim impact evidence, thus skewing the weighing process. Hence, I agree with the appellant that the trial court's failure to instruct the jury as he requested—that it could not use victim impact evidence either to weigh against mitigating circumstances or as a statutory aggravating factor in determining the appellant's fate—was prejudicial error, requiring a new sentencing proceeding.